UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**Ohio Asphalt Paving, Inc.,**

    Plaintiff,

-V-                                          Case No. 2:05-cv-0336
                                                  JUDGE SMITH
                                                  Magistrate Judge Abel

**Board of Commissioners of
Coshocton County, Ohio,**

    Defendant.

## OPINION AND ORDER

Plaintiff, Ohio Asphalt Paving, Inc. ("OAP") asserts a claim for injunctive relief under 42 U.S.C. § 1983, arguing that defendant Board of Commissioners of Coshocton County, Ohio ("Commissioners") violated OAP's due process and equal protection rights by failing to award OAP a contract for highway work. OAP moves for a preliminary injunction requiring the Commissioners to award the contract to OAP. For the reasons that follow the Court grants OAP's motion.

1

I. Background

OAP is a highway contractor. OAP's principal place of business is Knox County, which adjoins Coshocton County. OAP has been in business since the 1970s. The Commissioners are the governing board of Coshocton County, a political subdivision of the State of Ohio. Apache Aggregate and Paving Co. ("Apache")[1] is also a highway contractor. Apache is headquartered and has its principal place of business in Coshocton County.

On February 11, 2005, and again on February 18, 2005, Coshocton County advertised for bids for a road resurfacing project known as "Coshocton County Round 19 of the County's Issue II Resurfacing Program for 2005" ("Project"). The Project is to be funded by State of Ohio "Issue II" funds, with work to begin upon disbursement of those funds after July 1, 2005. Under the General Provisions for the Project, the roads will be available and work will begin after July 15, 2005. The parties agree that the Project is subject to Ohio's competitive bidding law, which requires, *inter alia*, that the contract be awarded to "the lowest and best bidder." Ohio Rev. Code § 307.90.

The Bid Documents provided, in part, "all materials . . .

---

[1] The Court grants Apache's unopposed motion to intervene.

shall comply with the current requirements of the State of Ohio Department of Transportation Construction and Material Specifications." The quoted language is the only reference in the Bid Documents to ODOT requirements. The Bid Documents also included "Bid Qualification and Responsibility Questionnaire for Contractors" ("Questionnaire"). The Questionnaire inquired as to the number of persons the bidding contractor would employ from Coshocton County.

OAP, Apache and The Shelly Company each submitted a bid. The Commissioners received and opened the bids on February 23, 2005. OAP's bid, $1,466,823.28 was the lowest; Apache's bid, $1,474,978.14 was the second lowest. Hence, the difference between the bids was $8,155.14, or less than one percent.

That same day, while the Commissioners were still in session, representatives of Apache spoke to the Commissioners, indicating to them that they "needed to award the contract to Apache for various reasons." Shortly thereafter, Bruce St. Clair, a principal of Apache, contacted Commissioner Kathleen Thompson and indicated to her that the contract should be awarded to Apache.

Later, St. Clair met with Commissioner Dane Shryock. St.

Clair showed Shryock the Ohio Department of Transportation's ("ODOT") Construction and Material Specifications ("CMS") manual referred to in the bid documents. St. Clair stated that OAP did not have a current 448 paving mix on file with ODOT as required by the CMS.

Commissioner Shryock then contacted ODOT. ODOT informed Shryock that OAP did not have current 448 paving mix approval, and indicated that OAP's 448 paving mix had not been current for eight to ten years. ODOT told Shryock that OAP probably could become current by submitting the appropriate paperwork. ODOT also told Shryock that OAP was in the process of remodeling and building a new plant, and that ODOT would examine the new plant within the next three weeks. ODOT also apparently told Shryock that Apache had current ODOT approval of its quality control program and testing laboratory, whereas OAP did not.

On March 23, 2005, the Commissioners adopted a resolution to award the contract for the Project to Apache. The Commissioners determined that Apache was the "lowest and best bidder" based upon the following two factors:

a.  Coshocton County's determination that 90% of Apache's workforce would be drawn from Coshocton County whereas 10% of OAP's workforce would be drawn from Coshocton County, as indicated by Apache and OAP in

their bid questionnaires.

b. Coshocton County's determination that OAP did not have a current 448 paving mix on file with ODOT, pursuant to the General Provisions in the Scope of Work Section of the Bid Documents.

ODOT does not engage in approval of paving design mixes unless ODOT is administering the project. The Project in the instant case is not an ODOT-administered project. ODOT itself does not require a contractor to have a previously approved 448 paving mix design on file prior to the awarding of the contract. Rather, ODOT requires a contractor to have an approved paving design mix at the time the contractor furnishes the material for the project. Moreover, the fact that a contractor has an approved paving mix design on file with ODOT does not necessarily mean that ODOT will approve the paving mix design will for a later project.

OAP seeks a preliminary injunction that would include the following:

1. An order prohibiting Coshocton County from awarding the contract for the Project to Apache, such prohibition to include Coshocton County's (i) execution of a contract with Apache to perform any work on the Project, (ii) authorization to Apache to perform any work on the Project, and (iii) payment to Apache for work performed on

the Project; and

2.  An order directing Coshocton County to award the contract for the Project to OAP under the terms of its bid.

## II. Standard of Review

The Court considers four factors in determining whether to issue a TRO or preliminary injunction:

> (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction.

Chabad of S. Ohio & Congregation Lubavitch v.City of Cincinnati, 363 F.3d 427, 432 (6th Cir. 2004). The factors are not prerequisites; rather, they must be balanced. Capobianco, D.C. v. Summers, 377 F.3d 559, 561 (6th Cir. 2004).

## III. Discussion

### A. Likelihood of success on the merits

OAP asserts that the Commissioners violated its rights to both substantive and procedural due process, as well as equal protection. In support of these claims, OAP relies primarily upon Enertech Elec., Inc., 85 F.3d 257 (6th Cir. 1996); and City of Dayton ex rel. Scandrick v. McGee, 67 Ohio St.3d 356, 360 (1981).

In Enertech, Mahoning County, Ohio solicited bids for a Justice Center construction project, including one for electrical work. To aid in the bidding process, the county published an employee handbook, which it made available to prospective bidders. The handbook stated that the county had negotiated a Project Labor Agreement ("PLA") with the Western Reserve Building and Construction Trades Council to govern the duties and responsibilities of all persons working on the project and to promote labor harmony. The handbook also provided that all trade contractors who performed work on the project would be required to ratify the PLA and operate under its terms.

At a pre-bid meeting, which the plaintiff in Enertech attended, the county informed bidders that aspects of the PLA were still under negotiation. At the time of the meeting, the local bargaining representative for electricians had not been selected.

As part of the bidding process, the county in Enertech mailed the plaintiff a questionnaire. The questionnaire asked the plaintiff whether it would sign the PLA, sign a collective bargaining agreement with the local electrical workers union, and commit to safety criteria. The plaintiff responded that the union which represented its electricians was not a signatory to

the PLA, and that it was in the process of negotiating a collective bargaining agreement with its own electricians. The plaintiff indicated that while it would agree to the safety criteria, it would not sign the PLA.

Following a rebid, the county in <u>Enertech</u> determined that the plaintiff was the low bidder. The county offered the contract to the plaintiff on the express condition that the plaintiff sign the PLA and the collective bargaining agreement with the local electricians' union. The plaintiff, however, responded that while it would sign the documents, it would not consider the local electrical workers union to be the collective bargaining unit for its employees because neither the PLA nor the bid documents had specified the local union.

The plaintiff in <u>Enertch</u> then brought suit against the county in federal court, asserting a deprivation of its property right to the contract without due process of law. The district court denied the plaintiff's motion for a preliminary injunction. The county then awarded the contract to the next lowest bidder. Thereafter, the plaintiff filed an amended complaint seeking damages for lost profits. The district court granted summary judgment in favor of the county and the local union.

The Sixth Circuit Court of Appeals affirmed the judgment

of the district court. Enertech, 85 F.3d at 261. The court of appeals explained that a bidder can demonstrate a protected property interest in a publically bid contract in one of two ways. Id. at 260. A bidder can either show that it actually was awarded the contract and then deprived of it, or it can show that the county abused its limited discretion in awarding the contract to another bidder. Id.

The appellate court then examined Ohio law, noting that the Ohio Supreme Court has held Ohio Rev. Code § 307.90 does not require the county to accept the lowest dollar amount; rather, the statute "'places in the hands of the [county] authorities the discretion of determining who under all of the circumstances is the lowest and best bidder.'" Enertech, 85 F.3d at 260 (quoting Cedar Bay Constr., Inc. v. City of Fremont, 50 Ohio St.3d 19, 21 (1990). The statute empowers the local government to make a qualitative determination as to which bid is both lowest and best. Id. (citing Dayton, 67 Ohio St. 3d at 358). Thus, local governments are vested with the discretion to award a contract based on the lowest and best bid, and a court may not interfere with a local government's exercise of this discretion unless the local government abused its discretion or acted fraudulently. Id. Under Ohio law, abuse of discretion "'implies an unreasonable,

arbitrary or unconscionable attitude.'" Id. (quoting Dayton, 67 Ohio St.3d at 359). Applying these principles, the court of appeals in Enertech reasoned as follows:

> We do not believe the county abused its discretion by determining that the "best" bidder would be a bidder willing to ratify the PLA. These terms, the ratification of the PLA and applicable local collective bargaining agreements, were added to secure labor harmony on the project and to govern the rights and responsibilities of project participants. The insertion of these terms is not inconsistent with Ohio's competitive bidding policy. Ohio's competitive bidding statutes were enacted " 'to provide for open and honest competition in bidding for public contracts and to save the public harmless, as well as bidders themselves, from any kind of favoritism or fraud in its varied forms.' " Cedar Bay, 552 N.E.2d at 204 (quoting Chillicothe Bd. of Ed. v. Sever-Williams Co., 22 Ohio St.2d 107, 258 N.E.2d 605, 610 (1970)). The PLA was included in the bidding process from the beginning, and it in no way interfered with openness and honesty of the bidding process. Furthermore, we find that the inclusion of the PLA in this bidding process neither resulted in favoritism nor fraud. We therefore conclude that in making ratification of the PLA a criterion for determining the lowest and best bidder, the County acted within its statutorily granted discretion.

Id.

The concept of abuse of discretion was also the guiding principle in Dayton. In that case, the City of Dayton advertised for and solicited bids for a public construction project. Fryman-Kuck General Contractors submitted the lowest bid, in the amount of $240,540. Leo B. Schroeder, Inc. submitted the

second lowest bid, in the amount of $241,690. Thus, the difference between the two bids was $1,150, or about one-half percent. The city awarded the contract for the project to Schroeder because Schroeder was a city resident.

The trial court in <u>Dayton</u> granted a permanent injunction against the city, prohibiting the city from entering into the contract with Schroeder and from making any payments to Schroeder under the contract. The court of appeals affirmed.

The Ohio Supreme Court affirmed the judgment of the appellate court. The court's decision rested on two fatal flaws in the city's determination that Schroeder was the lowest and best bidder. First, the court condemned the lack of notice of the residency preference:

> Despite the purported primacy of the policy to prefer resident bidders, appellants did not announce or disclose the existence of such policy to the bidders until after the bids were opened. It appears, therefore, that appellants made a conscious decision to withhold this pertinent information until after they had actual knowledge of the amounts of the bids. In effect, appellants modified their requirements without notice. This action tended to undermine the integrity of the competitive bidding process. <u>See</u> <u>Boger Contracting Corp. v. Board</u> (1978), 60 Ohio App.2d 195, 396 N.E.2d 1059.

<u>Dayton</u>, 67 Ohio St.2d at 359. The court then examined the testimony of the city's representative, who was unable to articulate any standard by which residency would be weighed:

> "(Appellants' counsel Mr. Randolph) Q. Now here again I might be engaging in speculation but, or asking you to, when you say to award contracts to business, that is not in every circumstance, is it?
>
> "(Schierloh) A. No it's not.
>
> "(Objection.) * * *
>
> "MR. RANDOLPH: The point is, your honor, the recommendation was made by the department director here and we would not want to leave the court with the impression that he always recommends the contract go to the local bidder and the question is if the difference in the award were, say ten percent, what his recommendation would be, would his recommendation be the same? * * *
>
> "(Schierloh) A. Well if you, if the items have been entered and as we state, the difference is approximately one half of one percent difference, we'd recommend we go this way. If the difference were many percentages greater than that, I would not say we at all could recommend that to the department or City Manager for approval, in fact, we have not in the past done that." (Emphasis added.)

Dayton, 67 Ohio St.2d at 360.  In light of this testimony, the court found that the lack of any discernable standard for preferring the resident bidder resulted in an abuse of discretion:

> The evil here is not necessarily that "resident" bidders are preferred but that there are absolutely no guidelines or established standards for deciding by how "many percentages" a bid may exceed the lowest bid and yet still qualify as the "lowest and best" bid. Absent such standards, the bidding process becomes an uncharted desert, without landmarks or guideposts, and subject to a city official's shifting definition of what constitutes "many percentages." Neither contractors nor the public are well served by such a situation.

12

> While municipal governing bodies are necessarily vested with wide discretion, such discretion is neither unlimited nor unbridled. The presence of standards against which such discretion may be tested is essential; otherwise, the term "abuse of discretion" would be meaningless. In its opinion, the trial court stated that: " * * * (t)he lack of an announced standard and priority of miscellaneous considerations allows unbridled discretion and political favoritism." We find neither allegation nor proof of political favoritism. However, we do find, due to the lack of announced standards, that appellants' action in this case was arbitrary. Accordingly, the judgment of the Court of Appeals is affirmed.

Id. at 360-61.

Under Enertech and Dayton, the issue in the instant case is whether the Commissioners abused their discretion in determining that Apache was the lowest and best bidder. The Court will begin by examining the Commissioners' rationale for their determination that Apache was the lowest and best bidder.

The Commissioners offer two bases for their decision: First, 90% of Apache's workforce would be drawn from Coshocton County whereas 10% of OAP's workforce would be drawn from Coshocton County, as indicated by Apache and OAP in their bid questionnaires. Second, OAP did not have a current 448 paving mix on file with ODOT.

Here, unlike Dayton, the inclusion of the question concerning workforce residency arguably put OAP on notice that the Commissioners might consider workforce residency in

13

determining the lowest and best bidder. Such a notice does not, however, satisfy the standard set forth in Dayton. The Commissioners were required not merely to announce that they were going to consider workforce residency, but they were further required to give notice of the *standard* by which workforce residency would be considered. In the instant case, the Commissioners do not appear to have created or followed, let alone announced, any standard for evaluating how much weight to give the fact that 90% of Apache's workforce resided in Coshocton County. Under Dayton, the Commissioners' use of workforce residency as a factor in determining who was the lowest and best bidder was, in the absence of a previously announced standard, an abuse of discretion. The Court will proceed to examine the second basis for the Commissioners' determination that Apache was the lowest and best bidder.

The sum and substance of the Commissioners' analysis of the second reason for their decision is as follows: The Bid Documents provided, in pertinent part, "all materials . . . shall comply with the current requirements of the State of Ohio Department of Transportation Construction and Material Specifications." The Commissioners interpreted "shall comply" to mean "shall comply *before the contract is awarded.*" Taken to its

logical conclusion, this interpretation would have required all of the bidders to have complying materials on hand for the project at the time the contract was to have been awarded. This would, of course, be an absurd result. The next leap in logic was to assume, based on the representation of an interested party, and without adequate investigation, that the lack of a current approved 448 paving mix on file with ODOT meant that OAP was less likely to be capable of performing under the contract. The Commissioners' mistaken belief that ODOT pre-approval of the 448 paving design mix was required led the Commissioners to the erroneous conclusion that OAP had not complied with the CMS manual, and therefore could not be the lowest and best bidder. The evidence shows ODOT does not engage in approval of paving design mixes unless ODOT is administering the project. ODOT itself does not require a contractor to have a previously approved 448 paving mix design on file prior to the award of the contract. Rather, ODOT requires a contractor to have an approved paving design mix at the time the contractor furnishes the material for the project. Moreover, the mere fact that a contractor has an approved paving mix design on file with ODOT does not necessarily mean that ODOT will approve the paving mix design for use in a later project. Significantly, there

is no evidence in the record suggesting that the absence of a current approved paving mix design on file with ODOT provides any indication of a contractor's actual ability to do a job.

The Commissioners argue that they are not bound by ODOT's interpretation of its CMS manual. This may be so, however, the Commissioners' interpretation of the CMS manual does not appear to be the result of any reasoned examination of the language of the manual or the bid documents. The Commissioners mistakenly believed Apache's representation that the CMS manual required prior ODOT approval of the paving design before the contract was awarded. If there was some support for the Commissioners' interpretation other than Apache's representation, the Commissioners' determination might be deemed rational. In the absence of such support, the Commissioners' decision was arbitrary.

That the Commissioners contacted ODOT does not alter the analysis. In essence, the Commissioners asked ODOT the questions Apache told them to ask. Having erroneously determined that Apache's proposed interpretation of the CMS was correct, the Commissioners proceeded to elicit irrelevant information from ODOT. It appears that the Commissioners did so without consulting with the county engineer. The Court finds

that the Commissioners, having relied primarily on an interpretation provided by an interested party, failed to make a reasonable inquiry into the facts and circumstances necessary to make a rational and informed decision.

Aside from the flawed decision-making process, the Commissioners' determination also runs afoul of the notice prong of <u>Dayton</u>. There is no indication in the record that the Commissioners provided notice to the bidders that bidders were required to have a current approved 448 paving mix design on file with ODOT in order to be awarded the contract. Indeed, given that ODOT only requires the approved paving mix to be on file at the time the materials are furnished, it would likely come as a surprise to bidders that a local government, using the same ODOT standards, would require such compliance before the contract was to have been awarded. The Commissioners therefore violated the notice requirement set forth in <u>Dayton</u>.

Based on the above, and on the current record, the Court finds that the Commissioners abused their discretion in determining that Apache was the lowest and best bidder for the Project. As a result, the Court finds that OAP has demonstrated a strong likelihood of success on the merits.

### B. Irreparable harm

The Court finds that the constitutional deprivation in this case constitutes irreparable harm.

### C. Harm to others

If the Court grants an injunction, Apache would be substantially harmed. This factor weighs against the granting of injunctive relief.

### D. Public interest

The Court finds that the public interest would be best served by requiring the local government to rationally administer the bidding process in accordance with predetermined standards, prior notice of which has been provided to the bidders.

The Court will proceed to balance the four factors. OAP has demonstrated a substantial likelihood of success on the merits. The Court has found that OAP will suffer irreparable harm in the absence of an injunction. An injunction would serve the public interest by preserving the integrity of the bidding process. The only factor that weighs against the granting of a preliminary injunction is the harm an injunction would cause to

Apache. Weighing these factors together, the Court finds that injunctive relief is appropriate in this case.

### IV. Disposition

For the above reasons, the Court **GRANTS** OAP's motion for a preliminary injunction.

The Court **PRELIMINARILY ENJOINS** the defendant as follows:

1. The Court enjoins Coshocton County, through its Commissioners, from awarding the contract for the Project to Apache, such prohibition to include Coshocton County's (i) execution of a contract with Apache to perform any work on the Project, (ii) authorization to Apache to perform any work on the Project, and (iii) payment to Apache for work performed on the Project; and

2. The Court directs Coshocton County, through its Commissioners, to award the contract for the Project to OAP under the terms of its bid.

**IT IS SO ORDERED.**

    /s/ George C. Smith
**GEORGE C. SMITH, JUDGE**
**UNITED STATES DISTRICT COURT**